DAVID ATCHISON v. STATE.

No. A-280. Opinion Filed December 11. 1909.

(105 Pac. 387.)

1. HOMICIDE — Instructions — Request—Different Degrees—In a prosecution for murder, the court should instruct the jury on the law of each degree of homicide which the evidence tends to prove, whether it be requested on the part of the defendant or not, and it is the duty of the court to decide, as a matter of law, whether there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree.

2. INSTRUCTIONS—Requests. An objection that the instructions as given by the court do not go far enough in stating the law of manslaughter in the first degree, **held** not prejudicial error, where the defendant fails to present to the court a more complete instruction with the request that it be given, and when the instructions taken as a whole fully and fairly state the law of the case.

3. HOMICIDE—Instructions. In a prosecution for murder, where defendant admitted killing deceased, and where the justification is that the homicide was committed in the lawful defense of his wife, upon reasonable apprehension of a design on the part of the deceased to do her some great personal injury and immi-

nent danger of such design being accomplished, it is proper to instruct in the language of the statute that: "Homicide committed with a design to effect death is not the less murder because he perpetrator was in a state of anger." And to further instruct that: "The jury are instructed that no provocation by words only addressed to the person killing or to another in his presence, however opprobrious or insulting, will mitigate an intentional killing, so as to reduce the killing to manslaughter, and although the jury may believe from the evidence that insulting epithets were used by the deceased to the wife of the defendant in the defendant's presence, yet if the jury further believe from the evidence, beyond a reasonable doubt, that the defendant immediately thereafter shot and killed the deceased, then the defendant is guilty of murder, unless the jury shall further believe from the evidence that said killing was reduced to manslaughter or was justifiable upon other grounds, or by other causes than the use by deceased of such opprobrious and insulting language. And in this connection I instruct you that if you believe from the evidence in this case that the defendant, when he fired the shot which caused the death of Ruel Anderson, was in a heat of passion produced by opprobrious and insulting words directed towards the wife of the defendant and while so in the heat of passion slew the deceased, then the defendant would not be guilty of murder, but of manslaughter in the first degree, provided that you find further that the killing of the deceased was without design on the part of the defendant."

4. STATUTES—Construction—Evidence—Admissibility. · Appellate courts should carefully consider and guard against so construing the law that a proper rule of evidence would be perverted into a means of escape from the merited punishment of an offender.

5. APPEAL—Harmless Error—Error Not Affecting Substantial Rights. Section 6957, Snyder's Comp. St. 1909. prescribes that: "On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties." The letter and spirit of the law is that, if the defendant has had a fair trial, and if this court is satisfied that the conviction is sufficiently supported by competent evidence, and that the verdict against the defendant was not reached by error or as the result of passion or prejudice, the conviction should be affirmed.

(Syllabus by the Court.)

*Appeal from District Court, Canadian County; John J. Carney, Judge.*

David Atchison was convicted of murder, and he appeals. Affirmed.

David Atchison, plaintiff in error (hereinafter designated the "defendant"), was indicted in the district court of Canadian

county on the 17th day of December, 1908, for the murder of Ruel Anderson. Upon arraignment a plea of not guilty was interposed. Said cause came on for trial March 1, 1909. The jury returned a verdict finding the defendant guilty of murder, and assessed his punishment at imprisonment for life at hard labor. A motion for new trial having been filed on March 6, 1909, it was by the court overruled and exception allowed. Whereupon the court pronounced judgment and sentence in accordance with said verdict. The defendant gave notice of appeal, and on August 5, 1909, there was filed in this court his petition in error with case-made attached; also, a stipulation on behalf of the defendant and the state requesting that the cause be advanced.

The facts disclosed by the testimony for the state are, substantially, as follows: The defendant, a man about 45 years of age, was living at the time of the tragedy with his wife and two daughters upon a farm in Mustang township, Canadian county, owned by Dr. Earp. He was farming the place upon the shares. The deceased, Ruel Anderson, a youth of about 18 years, the eldest son of a widowed mother, with a younger brother, moved about six weeks before the tragedy on an adjoining farm, owned by Dr. Earp. The houses on the tracts were about 300 or 400 yards apart. The deceased was a nephew of Dr. Earp, and was his representative in looking after the work stock, and to see that Dr. Earp received his share of the crops. Another house on the farm was occupied by Wesley Bejack, another tenant. There was some discord between the defendant and the deceased over the crops, and ill feeling existed between them. Dr. Earp came to the place a few days before the tragedy, and objected to defendant gathering the corn in patches all over the field, and informed defendant that the deceased was there to represent him in looking after his stock and after his interest in the crops. On Sunday, October 18th, the day before the tragedy, the defendant went to the town of Mustang, had his shotgun repaired, and purchased a box of shells loaded with No. 8 buckshot. He also purchased on that day a revolver which was loaded, and gave it to his wife. On Monday morning, October 19th, about 9 o'clock a.

m., the deceased went to the house of the defendant for the purpose of informing him that a wagon which he wanted to use was ready for him. In a few minutes after his leaving, a daughter of the defendant came running to the deceased's house and called his brother Tom to come up there. Tom · Anderson, · hearing her call, went to the defendant's house, and there found his brother lying dead four or five feet from the doorstep, in a pathway that led from the back door of the defendant's house southwesterly toward the house where they lived. He had been shot in the back of the neck with a charge of buckshot. His neck was broken, and death was instantaneous. The only eyewitness of the homicide were the wife and two daughters of the defendant.

The testimony on behalf of defendant, in substance, is: That defendant moved his family upon this farm about the first of March, 1908, and farmed the place under an agreement to be furnish with implements and teams, and he was to give one-half of the crop, share and share alike, for the use of the place, implements, and teams. That Dr. Earp was the owner of a farm near Piedmont. That he kept both places going, moving work stock and some of his implements from one place to the other, which caused some interruption in defendant's farming. That the conduct of deceased was such that defendant's family were afraid of him. That he was overbearing and insolent in his conduct toward defendant and his family. That on the Thursday before the tragedy defendant's eldest daughter took their horse and went over to the Bejack place to get Dr. Earp's buggy. That the deceased informed her that she could not take the buggy. She returned home, and defendant then went to Bejack's house to get the buggy.

The testimony of Mrs. David Atchison, wife of the defendant, as to what then transpired, is as follows:

"Q. Mrs. Atchison. you testified that the girl did not procure the buggy when she went over to get it that noon? A. Yes, sir. Q. What was then done? A. Why, Mr. Atchison then went over to find out the reason why they could not get it. Q. What did you do? A. In the meantime I had went after a pail of water

and was over there at the Earp house.  Q. What transpired then?
A. Well, I was on the porch getting the pail of water.  The
pump is right at the door, and Mr. Atchison was standing on
the porch just outside, and he asked Bejack if he was going to
use the buggy that afternoon, and Bejack answered, 'No.'  Then
Mr. Atchison says, 'Well, then I guess I will use it,' and Bejack
answered him, 'No., you can't use it,' and Mr. Atchison says,
'Why?'  He says, 'Because you can't,' and Mr. Atchison says,
'Did Dr. Earp say I could not use it?' and Bejack answered, 'No,
I say so,' and Anderson spoke up and says, 'I say so, too.'  Well,
Mr. Atchison says, 'If that is the case, I will hitch onto the
buggy,' and he took his horse out and was going to hitch onto the
buggy, when Bejack run out of the house—  Q. You may state
whether or not Mr. Anderson was there, and what he did.  A.
Yes, sir; Anderson was there, and he ran out with clinched fists
and attacked Mr. Atchison.  Q. State what happened.  A. And as
he—Mr. Atchison was on the opposite side of the horse, and An-
derson run around the horse and was taking him from the rear
when I grabbed Anderson by the shirt collar, and held him, kept
him from striking my husband, and I held him by the shirt
collar until he broke loose.  Q. Was any conversation there had,
anything said?  A. Yes, sir; he kept using—calling my husband
the vilest names that can be called him, and saying, 'I will kill
him!  I will kill him!'  And he kept repeating it, 'I will kill
him!'  And all the time adding this name and cursing.  Q. After
those threats, did he make any further attack on Mr. Atchison
at that time?  A. Yes, sir; he again attacked him in the same
way coming up from behind him, and I caught him the second
time.  This time I got him by the throat and held him.  Q. Yes.
A. And then he turned on me, and he swore at me, and calling
me vile names, and he said, 'If you don't leave me alone I will
knock your head off,' added with an oath at that time, and he
drawed his fists and came right down in my face, just missing
me, just missed striking me at that time.  Q. What, if anything,
prevented him at that time from going further?  A. Bejack
caught him and told him to behave himself.

"Q. You may state what further occurred there, Mrs. Atchi-
son. A. Well, he kept on abusing us  and calling us names, and Mr.
Atchison says, 'Well, it is not worth quarreling about,' and he
says, 'I will go home,' and he told me to get my pail of water
and come with him, and he took his horse and started towards
the road.  I went to the well to get my pail of water, and Ander-

son jumped up on the porch right in front of me with clinched fists, and he swore an oath and called Mr. Atchison a bad name, he said now I' have got that * * * old * * * scared out, now I am going to whip you, and I am going to whip all your family. I said, 'Is that so.' He said, 'Yes, I will kill him,' swearing and calling him this bad name, and he said, 'I will kill him.' I says, 'If you kill him, you will have to kill me too.' He said, 'I will kill you. I would cut your heart out and throw it to the dogs.' And Bejack was still behind him, and—well, I wasn't to tell what Bejack said. Q. What stopped him from further action? A. He ordered me off the place. Told me to go home and stay there, not to come back there again in fear of my life, on any condition not to come back again, or he would kill us, and I took the pail of water and went home and I never come back on the place. Q. What day was this? A. That was Thursday at noon. Q. Thursday at noon, Thursday the 16th? A. I suppose it was. Q. The 15th of October? A. Yes, sir. Q. Had he ever made any other threats than such as were made there at that time? A. No, sir; none only the same kind of threats. Q. What did you next do? A. After Atchison and I went home, we went over and dug sweet potatoes, or picked them up rather, and we discussed this affair between ourselves, and we made up our minds it was not safe for us to stay there, and we got our work in shape about 5 o'clock and we went home. Q What did you next do? A. Why, we were both in the house at the time, and we were getting ready to go to Mustang to see an officer, when Anderson came to our house horseback. He rode up to the front door on his horse, and he asked my oldest daughter if her father was home, and she didn't know her father was in the house, and she answered him, 'No.' He just wheeled his horse and rode to the back door, and he called her again, and he said, 'Is your mother at home?' She said, 'Yes, sir; mamma is here.' He said, 'Tell your mother I want to see her.' Mr. Clark: Was that in your presence? A. Yes, sir; I was there in the house, and she came to the other door, and says, 'Mamma, Anderson wants to see you,' and I turned to Atchison, and I said: 'I don't want to see him. I don't want to talk to him at all, because he will only insult us, insult me again.' Atchison said: 'See what he wants to say? Maybe he is sorry for what he done at noon and has come over to apologize, and, if he has, just let it go.' I went to the door, and I said, 'Good evening,' to Anderson, and he replied to me, he says, 'Why in hell wasn't them horses watered

and fed at noon.' 'Well,' I says, 'as far as their being watered was concerned, I know they were watered, because they drank when we crossed the creek.' He swore at me, calling me a bad name, and he says, 'You are a liar, and I can prove it by Bejack.' Then he kept on abusing me, and saying the horses was not fed, and he says, 'Another thing I want to tell you, I am coming over to-morrow morning, and I am going to measure up those potatoes.' I said: 'No, you are not going to come over here and measure up our potatoes. You haven't any business on this place at all. We can attend to our own affairs.' He said, 'I have business here, and you will find it out.' I said: 'Anderson go off this place, and stay off this place and leave us alone. We don't want no trouble with you at all. All we ask is to be left strictly alone.' He said: 'What would you do if I would not go off from here? Would you shoot me?' I said, 'No, we are not making any threats against anybody.' He swore an oath, and he says, 'I am making threats, and I intend to keep them.' He says: 'You can fetch an officer here and put me under arrest if you want to. I would just as soon be behind the bars as anywhere else.' I thought I would make an appeal to his manhood. I said, 'You ought to be ashamed of yourself to talk like you do, and, if you haven't any respect for yourself, you ought to respect your mother.' And he said, 'Yes I have a mother,' and he swore an oath, and, well, I am not going to repeat the words he called me; but, if his mother was the kind of person that I was, he would not own her. Q. That is what he said to you? A. Yes, sir; to me. * * *

"Q. You saw the deceased, Ruel Anderson, the following Monday, did you? A. Yes, sir. Q. You may state under what circumstances? A. Well, it was in the morning just after breakfast, probably 8 o'clock, between half past 7 and 8. I was sitting in the kitchen by the west door, and I saw Anderson coming across our back yard coming up to our house. Q. He was afoot? A. Yes, sir; he was afoot. Q. Now you may state particularly about what he was doing? A. Why, he was walking towards the house with a—he had a knife in one hand, and a stick in the other. He was cutting a stick, and as he had been told to keep away a good many times, and I didn't know what business he had there, I stepped to the door to prevent him from coming in, as was his habit of walking in the house without rapping or asking any permission, and I stepped to the door and stopped him just a few steps away, and asked him what his business was. Q. What

reply did he make? A. He said, 'Why in hell ain't you out pick-
ing up sweet potatoes?' Q. You may state then what followed in its
order. A. I told him, I said, 'Anderson,' I said, 'haven't you had trou-
ble over here without coming back again?' I said: 'We would
like you to go off this place and stay off from it. We don't want
no trouble with you. All we ask is to be left alone until our crop
is gathered.' And then he raised his knife in his hand, and he
just commenced to swear at me, calling me vile names, and he
says, 'I don't have to go off from here for the likes of you,' and
as he said that he made a leap in the middle of the door with his
drawn knife, and I was standing right in the door, and I jumped
back to the side, and my two daughters were in the kitchen at the
same time. They both screamed. They saw it. They screamed,
'Papa, come quick!' I screamed, 'Oh! papa!' Mr. Atchison was
in the front room when he heard Anderson start to make this re-
mark. He picked up his gun and come through the door, and he
saw Anderson standing there with the knife in my face, and he
fired his gun."

Maud Atchison and Amy Atchison, daughters of the defend-
ant, testifying, reiterated the foregoing testimony.

The defendant testified, in part, as follows:

"Q. What did you next do after that? A. I went to the
justice of the peace to try to have him arrested. * * * Q.
You may state what you did in that respect, Mr. Atchison. A. I
stated my case to the justice of the peace. * * * Q. Wait a
moment, what time in the evening was it Thursday evening that
you went to see the justice of the peace at Mustang? A. About
6 o'clock. Q. About 6 o'clock? A. Yes, sir. Q. Did you see
Ruel Anderson that evening? A. Yes, sir. Q. Where? A. In
the hardware store. Q. At Mustang? A. Yes, sir. Q. Now,
after returning home what did you next do in the premises? A.
On the premises? Q. No? A. On, well, this was in the even-
ing. The next day I went to Yukon. Q. What for? A. To
see a justice there. Q. Did you see one? A. Yes, sir. Q. Did
you transact any other or further business there in Yukon? A.
No, sir. Q. When, if at all, did you see Mr. Farris at Yukon?
I ask this simply for the purpose of fixing the date, as I am a
little confused? A. That was Sunday. Q. That was the fol-
lowing Sunday? That is what I wanted to know. After seeing
the justice of the peace at Yukon, what did you next do with
reference to this matter? A. I went to see the prosecuting at-

torney up here in El Reno on Saturday. Q. That was the next day, Saturday? A. That was the next day, Saturday. Q. You saw the county attorney? A. I saw the county attorney. Q. Talked with him about this trouble? A. Yes, sir. Q. Did you state the matter fully to him as it stood at that time? A. Yes, sir; I did. Q. What, if any, relief from it did you apply to him for? Mr. Clark: That is objected to. The Court: Sustained. Mr. Gillette: To which we except. Q. Did you get any relief or assistance from that source? Mr. Clark: That is objected to. The Court: Sustained. Mr. Gillette, Jr.: Exception. Q. What was your object in applying to these several officers in the premises? Mr. McAdams: We object to it as incompetent. A. To avoid trouble. Mr. McAdams: Wait a minute—as immaterial and self-serving declaration. The Court: Objection sustained. Mr. Gillette, Jr.: Exception. Mr. Gillette: I desire to make the record show— The Court: Gentlemen of the jury, you are excused for five minutes. Mr. McAdams: Perhaps that is not necessary."

Dictated out of hearing of the jury:

"Mr. Gillette, Sr.: The prosecution in this case has been permitted to show that shells, shotgun shells, were purchased in Mustang and a revolver there purchased, as a part of the state's case, and as evidence of premeditation and deliberation in the commission of this act. The evidence sought to be shown by the above questions is in rebuttal of that fact, and intended to show that the defendant was seeking to avoid the difficulty, and, if he were permitted to answer, would show that he visited the justice of the peace at Mustang and at Yukon and the county attorney at El Reno for the purpose of seeking legal aid in the way of peace bonds to avoid difficulty, and this evidence is offered in rebuttal of the presumption which arises by the proof on behalf of the state of the fact of the purchase of the shells and revolver, and we ask to have it admitted. The Court: The offer and request of the attorneys for the defendant of the testimony above set out is overruled. Mr. Gillette, Sr.: Note our exceptions."

In the presence and hearing of the jury:

"Q. Well, you returned from El Reno after seeing the county attorney? A. Yes, sir. Q. What time did you arrive at your home? A. About 11 o'clock Saturday evening. Q. About 11 o'clock? A. About that time. I didn't have a watch. Q. What did you do next day? A. I went down to Mustang

and saw the justice of the peace there, Mr. Dennis, in the morning. * * * Q. You may state, Mr. Atchison, what transpired at your place the next morning? A. Monday morning? Q. Yes, sir. A. Why, I was sitting, after breakfast—my wife and I got up and had breakfast, and after breakfast I was writing a letter, and while I was writing I heard Ruel Anderson's voice stating to my wife, 'Why in hell ain't you out digging sweet potatoes?' My wife says: 'Haven't you made us trouble enough? Why won't you go away and leave us folks alone?' He says, 'We don't have to take orders from you, and we are not taking any orders.' 'Now,' she says, 'all we ask you to do is to go away and stay away.' He says, I overheard, 'I am not going for a God damned old son of a bitch like you.' And while he was saying this, while I was overhearing it, I heard one of my daughters, I could not swear which one it was, but all three of the women folks seemed to yell at once, but I heard, 'Papa, come quick!' I jumped up, and as I was going through the door I grabbed my gun, and just as I was going through the door, I was coming as quick as I could, I saw Ruel Anderson in front of the door. I sees my wife jump back, and his hand was up that way reaching that way. I put up the gun as quick as lightning and fired without aim. Q. Result of that shot was? A. Was fatal. Q. Was fatal? A. Yes, sir."

On rebuttal Wesley Bejack testified that he was present and heard all that was said at the time of the trouble over the buggy, and that the deceased neither assaulted nor threatened nor used language as testified to by the defendant and his wife.

Mrs. Atchison testified that she went immediately to the body of the deceased, and that she then noticed no knife. This was before his brother had been sent for, or before any other person had appeared upon the scene. George Church, the officer who placed the defendant under arrest, testified that he arrived soon after the homicide, and, on being told that the deceased had drawn a knife, told the defendant that he had better take care of the knife, and he made a search for it, but could not find it, although the ground where the deceased fell was level and bare.

Wesley Bejack testified that the deceased did not own or carry a knife. To the same effect was the testimony of Hiram

Earp. T. J. Van Arsdale testified that he helped the coroner care for the body and did not see any knife.

Witness Shupe testified that he examined the clothes of the deceased and searched the pockets and found some smoking tobacco, some matches, a small pocketbook containing a pair of cuff buttons and a penny, also a piece of chewing tobacco. One side of the piece was square, and the rest looked like it had been bitten off, and that he found no knife.

Gene Moore testified: That he was with the deceased on Sunday afternoon before he was killed; that deceased did not have a knife on that day; that deceased borrowed witness' knife to trim his finger nails and then returned it. .

*Gillette, Libby & Gillette,* for plaintiff in error.

*Charles West,* Atty. Gen., *Charles L. Moore,* Asst. Atty. Gen., and *E. G. McAdams,* for the state.

DOYLE, JUDGE (after stating the facts as above). On the morning of the 19th day of October, A. D. 1908, about 9 o'clock, Ruel Anderson was shot and killed by the defendant, David Atchison. At the time deceased was shot, he was near the back door of the house in which the defendant lived. He was shot with buckshot; the charge entering the back of his neck. His neck was broken, and death was instantaneous. It is very clear from the evidence, and the physical indications at the place of the killing showed convincingly, that the defendant, when he fired the fatal shot, was waiting with a formed design to kill and murder the deceased. He had fully prepared himself the evening before to kill, and he shot upon sight. Unquestionably the homicide was a deliberate assassination. The previous preparation and physical facts rebut and absolutely repel the theory of justifiable homicide, in the lawful defense of his wife from an imminent felonious assault.

The defendant complains that there was material error in the trial of said cause to the prejudice of his substantial rights, in that the court erred in excluding material evidence offered by him,

3 Cr.—20

and that the court erred in instructing the jury. The defendant, testifying on his own behalf, was asked what efforts he made to avoid trouble with the deceased? He testified about consulting a justice of the peace at Mustang to have the deceased placed under a peace bond, and that the next day he went to a justice of the peace at Yukon and consulted him. On the next day he went to El Reno and stated the matter to the county attorney. He was then asked: "What was your object in applying to these several officers?" Objection being sustained to this question, the court excused the jury. Counsel for the defendant thereupon stated the purpose of the questions propounded, and what was expected to be proved thereby. This was objected to and excluded by the court. The same proof was offered with the wife of the defendant as a witness, and the same objection was sustained. No claim was made by the defendant that he believed himself in danger, or that the killing was in his own necessary self-defense. His plea of justification is that the killing was necessary in the lawful defense of his wife, as he had reasonable ground to apprehend a design on the part of the deceased to do her some great personal injury, and that there was imminent danger of such design being accomplished. If, at the time of the overt act, the defendant did not in fact believe his wife in imminent danger from the deceased, the homicide was murder. The facts went to the jury that he had consulted certain officers for the purpose of securing a peace warrant. This was sufficient. An appellate court should carefully consider and guard against so construing the law that a proper rule of evidence would be perverted into a means of escape from the merited punishment of an offender. What he said, and what the said officials said to him and his wife, would be merely self-serving declarations and hearsay.

The court instructed the jury as to the crime charged in the indictment, the plea interposed, and that the burden was upon the state to prove beyond a reasonable doubt the material allegations of the indictment and every element and ingredient of the crime charged on the presumption of innocence, and that the in-

dictment was merely an accusation, and no evidence of guilt; defined the phrase, "a reasonable doubt," and the terms, "homicide," "murder," "manslaughter in the first degree," and "manslaughter in the second degree"; also, that homicide is justifiable when committed by any person in either of the following cases:

"First, when resisting any attempt to murder such person, or to commit any felony upon him or her, or upon or in any dwelling house in which such person is; or, second, when committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished."

In all the court gave 19 instructions. On the defendant's objections, exceptions were allowed to instructions numbered 8, 11, 12, 13, 14, and 15, as follows:

Instruction No. 8:

"You are instructed that homicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger. (Excepted to by defendant as not being sufficiently full to give the jury a full understanding of the law on that question.)"

Instruction No. 11:

"If you find from the evidence in this case, beyond a reasonable doubt, that in the county of Canadian, state of Oklahoma, on or about the 19th day of October, 1908, the defendant, David Atchison, shot and killed Ruel Anderson with a shotgun, and that he fired the shot which killed Anderson without authority of law and with a premeditated design to effect the death of the said Anderson, you will then find him guilty of murder as charged in the indictment, and fix his punishment at death or imprisonment at hard labor in the penitentiary for life, in your discretion. (Objected to because the instruction ignores the last phrase of the statute defining manslaughter in the first degree and excludes the same from the consideration of the jury under the facts presented by evidence submitted.)"

Instruction No. 12:

"If the killing of Ruel Anderson was not justifiable as defined in these instructions, and you entertain a reasonable doubt

as to whether the shooting of the said Anderson was done with a premeditated design to effect his death, and you do believe from the evidence beyond a reasonable doubt that the defendant fired the fatal shot while in the heat of passion, and with no premeditated design to kill the said Anderson, you will then find him guilty of manslaughter in the first degree. (Excepted to as not being sufficiently full to give a complete understanding of the law involved.)"

Instruction No. 13:

"The jury are instructed that no provocation by words only addressed to the person killing or to another in his presence, however opprobrious or insulting, will mitigate an intentional killing, so as to reduce the killing to manslaughter, and although the jury may believe from the evidence that insulting epithets were used by the deceased to the wife of the defendant in the defendant's presence, yet if the jury further believe from the evidence, beyond a reasonable doubt, that the defendant immediately thereafter shot and killed the deceased, then the defendant is guilty of murder, unless the jury shall further believe from the evidence that said killing was reduced to manslaughter, or was justifiable upon other grounds, or by other causes than the use by deceased of such opprobrious and insulting language. And in this connection I instruct you that if you believe from the evidence in this case that the defendant, when he fired the shot which caused the death of Ruel Anderson, was in a heat of passion produced by opprobrious and insulting words directed toward the wife of the defendant, and while so in that heat of passion slew the deceased, then the defendant would not be guilty of murder, but of manslaughter in the first degree, provided that you find further that the killing of the deceased was without design on the part of the defendant. (Excepted to by defendant as not stating fully or correctly the law governing under the evidence submitted.)"

Instruction No. 14:

"I instruct you that, when you have retired to your jury room to consider of your verdict and have selected a foreman, you will first consider as to whether the defendant is guilty of murder as charged in the indictment, and if you have a reasonable doubt from the evidence, facts, and circumstances of this case, or the lack of the same, under the instructions here given you, of the guilt of the defendant on the charge of murder, you will then abandon the consideration of that charge, and ascertain whether

under the evidence, facts, and circumstances of this case the defendant is guilty of manslaughter in the first degree. If, after having given this charge of manslaughter in the first degree thorough consideration, you entertain a reasonable doubt of the defendant's guilt of manslaughter in the first degree, it will then be your duty to abandon the consideration of the defendant's guilt of manslaughter in the first degree, and ascertain from the evidence, facts, and circumstances in the case whether the defendant is guilty of manslaughter in the second degree as defined in these instructions; and if, after having given the charge included in the indictment fair and thorough consideration, you entertain a reasonable doubt as to defendant's guilt of manslaughter in the second degree, it would then be your duty to acquit him. (Objected to by defendant because manslaughter in the second degree is not defined; the statute simply being quoted.)"

Instruction No. 15:

"If the jury believe from the evidence in this case that when the defendant shot and killed Ruel Anderson he had reasonable grounds to believe, and did believe in good faith, that his wife was in imminent danger of losing her life or sufferng great bodily harm at the hands of the said Ruel Anderson, and that there were no other apparently safe means of escape by his said wife from the impending danger, then the defendant had the right, and it was lawful for him in the exercise of reasonable judgment, to use such force as was reasonably necessary or apparently necessary to save and protect his wife's life or her person from great bodily harm, even to the taking of the life of the said Ruel Anderson. On such grounds, and under such circumstances, the defendant is justifiable under the law in the defense of his wife. The danger to one's life or of great bodily harm to his or her person by which the defendant pleads justification for his acts, as herein indicated, may be real danger or apparent danger; but, before the jury can acquit the defendant on the ground of defense of his wife, three essential elements must concur: First, defendant and defendant's wife must be without fault in bringing on the difficulty, and must not be disregardful of the consequences in this respect or any other wrongful word or act; second, there must have existed at the time either really, or so apparently as to lead a reasonable mind to the belief that there actually existed, a present imperious impending necessity to shoot in order to save himself or his wife from death or great bodily harm; third, there must have been no other reasonable mode of avoiding the necessity of taking the life of the

deceased, apparent to the defendant as a person of ordinary prudence and courage (objected to as not correctly stating the law applicable)."

It will be observed that instruction No. 8 above set out is in the exact language of section 2271, Snyder's Comp. St. 1909, except the words, "or voluntary intoxication at the time," are omitted. It is insisted that this instruction is erroneous, and counsel argue that:

"It may not be said that the provision of the statute is bad law, and yet we think there may be prejudicial error in quoting the statute as the law governing the deliberations of the jury. And when the bare provision of a statute is quoted as the instruction to a jury there ought, in connection with it, to be given such explanations as will enable the jury to intelligently consider it. And that anger may arise from a provoked cause, and we think is sometimes intentionally provoked, and when such is the case, and when the evidence shows such possibility, the jury should be given to understand that such heat of passion is not the anger referred to in the statute quoted, but is rather that referred to in the second sub-division of the statutory definition of manslaughter in the first degree."

It is also argued that the first sentence in the thirteenth instruction intensifies the error in giving the eighth without explanatory modification, and that the concluding clause, "provided you find further that the killing of the deceased was without design on the part of the defendant," wholly destroys this instruction. We do not believe that this contention is well founded. These instructions state the law. The latter half of instruction No. 13 covers the objection as made, and the proviso is based upon subdivision 2, § 2276, Snyder's Comp. St. 1909, defining "manslaughter in the first degree," and set forth in another instruction.

It is also insisted that instructions Nos. 11 and 12 are erroneous, and it is argued that the jury should have been advised, in view of the testimony of the defendant, his wife, and daughters:

"That they should consider the question as to whether or not the act of killing was necessary to prevent the commission of a crime, or the act of deceased so threatening as to cause such in-

terference by a reasonably prudent and courageous man who was in that way threatened by the deceased, and that if they found from the evidence that an attempt to commit a crime was at the time being made by the deceased, but that the killing by defendant, acting as a reasonably prudent and courageous man, was unnecessary to prevent it, the verdict in such case should be guilty of manslaughter in the first degree, instead of instructing that, if the act complained of was without authority of law, the jury should find the defendant guilty of murder."

And counsel in their brief further say:

"We desire here to call the attention of the court to the fact that, while there was evidence tending to show that the deceased was at the time of his death in the act of committing a crime, which made it incumbent upon court and jury to pass upon, there was no instruction given covering the phase of the case arising from an unnecessary killing in order to prevent such crime, if the jury found from the evidence that the deceased was at the time so in the act of committing an assault upon Mrs. Atchison. By such failure to so instruct, and instructing that the defendant must be found guilty of murder, if the killing was not justifiable, and was intentional, the defendant was deprived, over his objection, of the right to have the offense charged against him, considered in the light of the third subdivision of the statute defining manslaughter in the first degree. The defendant was not negligent in this respect, for his request to have this instruction modified was explicit, and the request was refused."

The objection made is as follows:

"The defendant, David Atchison, objects to the instructions, and asks that the same be not given to the jury until modified in accordance with the objections thereto as shown by the exceptions indorsed on the instructions and in accordance with objections here stated: First, because the instruction ignores the right of the defendant to have the degree of the crime reduced to manslaughter in the first degree. when the killing is perpetrated unnecessarily while resisting, as shown by defendant's testimony, an attempt by the person killed to commit a crime, to wit, an assault upon the person of the wife of the defendant, or after such attempt should have failed."

It is also argued that the error complained of in the eleventh instruction was accentuated by giving the twelfth instruction.

Section 6857, Snyder's Comp. St. 1909, provides:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict, and if it state the testimony of the case, it must in addition inform the jury that they are the exclusive judges of all questions of fact. Either party may present to the court any written charge, and request that it be given. If the court thinks it correct and pertinent, it must be given, if not, it must be refused. Upon such charge presented and given or refused the court must indorse or sign its decision. If part of any written charge be given and part refused the court must distinguish, showing by the indorsement or answer what part of each charge was given and what part refused."

It is well settled that the court in its instructions to a jury in a criminal cause must instruct them upon the law applicable to the evidence adduced upon the trial. This is the purpose of the instructions given by the court and is only properly fulfilled when the jury retire to deliberate fully informed upon the law which is to govern them in their deliberations.

"The charge should state the law in its application to the facts, as already explained, correctly and fully. If, for example, there are different degrees of an offense, the law of each degree, which the evidence tends to prove, should be given, but not of any degree which it does not tend to prove." (Bishop, Crim. Proc. par. 980.)

The theory of the state was that the defendant, with malice, or actuated by the spirit of revenge, deliberately shot the deceased, when there was no necessity for him to do so, to protect his habitation or family, and no circumstances at the time to justify a passion which caused him to shoot the deceased. The theory of defendant was that he shot and killed the deceased to prevent him from committing a felonious assault on the person of his wife, and he and his family so testify. The issue was clearly defined. If the theory of the defendant be supported by the facts, he was not guilty of any offense, but was entirely justified. If the theory of the state was correct, then the crime was murder.

The instructions of the court fully and fairly present the law of the case upon the theory of the defense, and also the law of manslaughter in the first degree by instruction No. 6, as follows:

"Homicide is manslaughter in the first degree when perpetrated without design to effect death, and in the heat of passion, but in a cruel or unusual manner, or by means of a dangerous weapon, unless it is committed under such circumstances as constitute excusable or justifiable homicide, or when the killing is perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed."

And instruction No. 9, as follows:

"The indictment in this case charges the highest degree of homicide; but the charge in the indictment embraces all the lower degrees of such crime, viz., manslaughter in the first degree and manslaughter in the second degree, as well as that of justifiable homicide. The defendant is presumed to be innocent of the crime charged and of each lower degree of crime embraced in the indictment, until the contrary is made to appear by competent evidence to the satisfaction of the jury, beyond a reasonable doubt; and, if you entertain a reasonable doubt of the guilt of the accused, it is your duty to return a verdict of not guilty."

There were no objections made and no exceptions were taken to these instructions. It is here insisted that they do not go far enough, and are therefore to that extent erroneous. In the absence of a more complete instruction presented to the court on the part of the defendant with the request that it be given, we cannot believe that the failure to explain the instruction defining manslaughter in the first degree constitutes error.

The vice imputed to instruction No. 14 is that "manslaughter in the second degree" is not defined. The question is: Does the evidence in the case show, or tend to show, any of the elements or ingredients of manslaughter in the second degree? Assuming the facts to be as claimed by the defendant in this regard and as shown by the testimony offered on his behalf, there was no such evidence adduced upon the trial. In *Cannon v. The Territory,* 1 Okla. Cr. 600, 99 Pac. 622, it was held by this court that it is the duty of the court to say, as a matter of law, if there is any evidence that would tend to reduce the degree of the offense to manslaughter in the second degree. Mr. Wharton says:

"The province of the court, on an issue as to the degree of a

homicide, is to guide and direct the jury, and keep them within proper bounds. It is its duty to determine whether competent evidence has been introduced, which, if believed by the jury, would furnish the elements or ingredients of any particular grade of homicide." (Wharton on Homicide [3d Ed.] p. 241.)

We are of opinion that, under the facts in this case, there was no evidence which authorized an instruction on the law of manslaughter in the second degree.

Finally, it is asserted that:

"The fifteenth instruction proceeds upon the ground that the jury must believe there was reasonable grounds for the defendant's belief that the wife of the defendant was in danger of suffering great bodily harm at the hands of deceased, and that there was no other apparently safe means of escape, when it should have stated that such fact as viewed from the standpoint of defendant, considering all the facts and circumstances shown upon the trial, was sufficient to justify the act complained of."

There is no merit in this contention. Considering the instructions of the learned trial judge as a whole, we do not find any inadequacy, nor do we find any indication whatever of either prejudice or partiality.

The only remaining assignment of error is that "the verdict and judgment are contrary to the law and the facts offered in evidence upon the trial." The questions presented by this assignment have been fully considered. Our views as to the sufficiency of the evidence to sustain the verdict were stated at the outset. We entertain no doubt on this question. The defendant was well and ably defended in the court below, and his eminent counsel in their brief before this court have learnedly elaborated on the few irregularities which occurred upon the trial; but the day is past in the administration of criminal law in this state for a criminal to escape the just penalty of the law on a mere technicality not involving a fundamental principle or a substantial right. Section 6957, Snyder's Comp. St. 1909, precribes that:

"On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

The letter and spirit of this law is that if the defendant has

had a fair trial, and if this court is satisfied that the conviction is sufficiently supported by competent evidence, and the verdict against him was not reached by error, or as the result of passion or prejudice, the conviction should be affirmed.

We have carefully examined the record, and in connection with the very able and elaborate brief of counsel for the defendant, have fully considered the questions presented. For the reasons herein stated, we are of opinion that the defendant had a fair and impartial trial, and that no error was committed prejudicial to his substantial rights.

The judgment of the district court of Canadian county is therefore affirmed.

FURMAN, PRESIDING JUDGE, and OWEN, JUDGE, concur.