## H. P. STRICKLAND v. STATE

No. A-7310. Opinion Filed March 22, 1930.
(287 Pac. 822.)

438

Wm. Blake and Ed Crossland, for plaintiff in error.

J. Berry King, Atty. Gen., Smith C. Matson, Asst. Atty. Gen., and N. B. Johnson, Co. Atty., for the State.

DAVENPORT, J. The plaintiff in error, hereinafter for convenience referred to as the defendant, was by information charged with the crime of murder; was tried, convicted of murder, and his punishment fixed at imprisonment for life in the state penitentiary. Motions for new trial and in arrest of judgment were filed, considered, and overruled, exceptions saved, and the case brought to this court on appeal.

Edward H. Fish, a witness called on behalf of the state, in substance testified:

"My home is at Chetopa, Kan. On the 5th day of September, 1928, I was at my brother-in-law's, John Griffith. near Limestone schoolhouse in Rogers county, Okla. I went to the home of S. T. Griffith and helped him gather some roasting ears. Somewhere about five o'clock in the afternoon me and Mr. S. T. Griffith and Sam Griffith left for Tulsa. At that time I did not personally know H. P. Strickland. Strickland lived about two hundred yards from S. T. Griffith. When we started to Tulsa with the load of roasting ears, I was driving the truck, Mr. Griffith

was sitting on the seat by my side, and Sam was sitting on the roasting ears behind me. As we came up the road, I figured it was too rough to pass another car, and I stopped to give the man approaching me plenty of room to pass. The car stopped on the west side of my truck about three feet from it. When the defendant drove up to my truck he opened the door of his car and jumped out as quickly as he could, and seemed to be very nervous. He reached back in his car; he was shaking. Nobody said a word. Nothing was said or done when he reached into the car with his hand. Mr. Griffith was sitting on the truck by the side of me. He got off and went around the front end of the truck. When Mr. Griffith got around in front of the truck, I noticed Mr. Strickland reach in his pocket and get out a pocketknife and started striking toward Griffith. As near as I could tell, the knife was closed. Strickland and Griffith met in front of the truck. The truck was about three feet from the east line of the fence. Strickland and Griffith scuffled around the truck to get over to the east side, Mr. Griffith kinder grabbed Mr. Strickland by the arms and bent him down over the fence and held both wrists and asked me to get over the fence and take the knife out of his hand. I got over the fence and reached down that way (indicating), and I seen the knife was shut. Mr. Strickland says, 'Boys, don't hurt me,' and I told Mr. Strickland I would not hurt him for anything in the world; 'Now you fellows don't have any more trouble.' Strickland started around the car and put his knife up, and I supposed was going to get in his car; he walked around the car, and the next thing I saw was him pulling his gun out of the car; that is, have it by the stock. Mr. Griffith started to run and hollowed, 'Oh, boys, don't let him shoot me.' I was on the east side of the truck and saw Mr. Strickland put the gun up that way (indicating) and shoot, the shot hit Mr. Griffith in the back; Strickland was about thirty or forty feet from the deceased at the time he fired the shot, when he was shot he just wheeled and said, 'Oh my God, you have killed me; don't shoot any more.' He went wobbling on up the

road a little ways and went down on his knees; he probably walked ten steps. I ducked behind the truck and stood there against the hind wheel and looked through under the truck. As near as I could tell, Mr. Strickland either reloaded his gun or done something to it, then got in his car and drove on down the road. As he drove away I went on around the truck, keeping it between me and him. He did not stay at the scene of the difficulty more than a minute after he fired the shot. The girl got out and walked on down the road; I mean Strickland's daughter-in-law, who was the daughter of the deceased; the daughter of the defendant was just standing there looking on when I first noticed her."

Considerable testimony was then taken as to how long the injured party lived, and what was done with reference to his remains. On cross-examination witness denied the deceased made any motion to the defendant to stop his car as he came up to the truck.

"My intention was as quickly as the defendant got by I would get out and crank my car and go on. The deceased was thirty or forty feet away from the defendant at the time the shot was fired. I never did leave my car during the trouble; I saw Sam Griffith running up the road."

Then follows several pages of the record on the cross-examination and redirect examination of the witness as to where he was at the time of the shooting and where Sam Griffith was.

Sam Griffith was then called as a witness for the state, and in substance stated he was a nephew of the deceased, and was with Ed Fish and his uncle at the time of the trouble.

"We stopped the truck to let Mr. Strickland by; we did not do anything, we just pulled to the east side of

the road and stopped. Mr. Strickland drove up even with our car, and got out of his car. He was trembling and reached right up in his car for his gun. No one in our car did anything, nor did any one say anything. Mr. Strickland got out; Virene got right out of the car and went down the road south; Mr. Strickland did not say anything when he got out of the car; he walked around in front of the truck. When Mr. Strickland got out of the car, Mr. Griffith got off of the truck and walked around toward the front of the truck. Mr. Strickland took his knife out of his pocket, it looked like a red knife. When Mr. Strickland started around the car, Mr. Griffith clinched him and held him there, and told my uncle to take his knife away from him. The defendant put his knife back in his pocket and walked around the front of the truck. When Mr. Strickland went to bring his gun out of the car I ran down north taking the section line, and then crossed over the fence after the shot was fired. Mr. Griffith was about forty feet behind me when the shot was fired; I got shot, one shot went into the flesh of my leg, and the other one went in there (indicating). I turned and looked back just as the shot was fired. The reason I turned was to see whether or not he was going to shoot. I came back after the shot was fired."

Witness was further examined and cross-examined as to his knowledge of what took place between the deceased and the defendant prior to the shooting, and what he was doing at the time the shot was fired.

The wife of the defendant was called as a witness, and testified to a remark she had heard made either by the defendant or his son as they were driving from defendant's home by the home of the deceased, in a car a short while after the shooting, the statement being "that you would not be bothered with the son of a bitch any more," the state contending the statement related to the deceased. This is in substance the testimony of the state.

The testimony on behalf of the defendant tends to show that he and the deceased had been on friendly terms, and were living near each other; that a son of the defendant had married a daughter of the deceased; that the son of the defendant and the deceased had had some conversation with reference to the son's hogs eating up some corn belonging to the deceased, in which the son said that his father said it did not make any difference if the hogs ate all the corn, as the deceased had gathered his part of the crop. The record shows this conversation was not communicated to the deceased.

The defendant's testimony shows that, before the trouble started, the defendant drove up to the truck in which the deceased was riding, and some one waved him to stop, that he thought there was some car trouble, and stopped his car and got out and went around to where the deceased was, and a fight or struggle began. The defendant's testimony tends to show that the deceased, when he came around the truck, had a knife in one hand and a rock or something else in the other; and that the daughter-in-law of the defendant, when the car stopped, got out of the car and went on up the road. The daughter of the defendant remained at the car. The deceased got the defendant down in some way and was holding him down, and the daughter of the defendant interfered, and, when she did that, the deceased applied an epithet to her, calling her a slut, and said he would knock her head off or do her some injury, the exact language not being given definitely, and turned his attention from the defendant and started to strike the daughter, and she started to get out of his way. The defendant says the deceased was pursuing his daughter, and, in order to protect his daughter, he secured a gun from the car and fired the shot that took the life of the deceased; that when he fired the shot

he believed it was necessary to protect his daughter from receiving great bodily harm at the hands of the deceased; that the deceased was pursuing his daughter in a threatening manner at the time. The testimony of the defendant is in substance corroborated by the daughter of the defendant. There is a great volume of testimony as to minor details relating to the two families and as to what took place prior to, and just after, the shooting. The defendant admits he fired the shot, and in detail tells the circumstances of what happened at the time he shot, claiming justification in firing the shot in order to protect his daughter. The testimony shows that, when the defendant got out of his car before the shooting, the deceased got off the truck and walked around to the front of the truck and went into a clinch, no words passed between the parties that any one heard, and the only reason found in the record that tends to offer a motive for the trouble between the deceased and the defendant is the conversation the deceased and the son of the defendant had a day or two before the killing regarding the hogs, and what the son told the deceased his father said about the corn.

There is very little conflict in the testimony between the state's witnesses and defendant's witnesses as to the facts which led up to the starting of the difficulty. The conflict of the testimony as disclosed by the record begins after the separation of the deceased and the defendant, when it is admitted by all the testimony that the deceased had the defendant down, and the state witnesses contend that Ed Fish assisted in the separation, and defendant's witnesses contend that the daughter of the defendant by her actions caused the deceased to quit his struggle with the defendant and turn to her.

This is all the testimony that is deemed necessary to set out for the purpose of an opinion in this case.

The defendant has assigned thirty-nine errors alleged to have been committed by the court in the trial of his case. Counsel for the defendant in the brief divides the assignments of error into five questions. We will first consider the second question presented in the brief of the defendant, which is the refusal of the trial court to direct a verdict of not guilty of murder.

The question of the degree of crime is for the jury. Section 2739, Comp. St. Okla. 1921. Under the provisions of section 1735, Comp. St. Okla. 1921, "a design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution."

If under the testimony in this case the jury found the shooting was unlawful and not in necessary self-defense, it would still be the duty of the jury, under the statute, to determine the degree of the homicide of which the defendant was guilty, either murder or manslaughter in the first degree, and the question as to whether or not a design to effect death was formed instantly before the act of killing, or whether the killing was upon a sudden provocation and without previous design to effect death, was in the exclusive province of the jury to say. The court did not err in overruling the motion of the defendant for a directed verdict of not guilty of the crime of murder.

The third question presented by the defendant is the action of the trial court wherein the defendant claims the court admitted incompetent, irrelevant, and immaterial evidence which materially prejudiced his substantial rights. The testimony complained of by the defendant is the testimony of the wife of the deceased and her daughter, who testify that, when the defendant and Merll Strickland

were leaving the defendant's home, after the defendant had arrived with Johnie and Virene Strickland, they heard somebody in the car say, "You will not be bothered by the son of a bitch any more." It is urged by the defendant that the admission of this testimony was prejudicial to the rights of the defendant, as neither of the witnesses could testify as to whether it was the defendant made the remark or Merll Strickland. The remark would indicate that whoever made the remark made it to some one who had been bothered by the deceased. This record does not show that any one had had any trouble with the deceased except the trouble Merll Strickland had with reference to his hogs eating up the corn of the deceased.

The father and son were in the car together, and, his son being the only one that had had trouble with the deceased, it would seem there could be no reasonable question but that this statement was made by the father, the dedefendant in this case, to his son Merll Strickland. As there were a number of eyewitnesses to the difficulty between the deceased and the defendant, and this conversation was held after the killing, we do not think the admission of the testimony in any way whatever prejudiced the rights of the defendant.

The fourth question presented by the defendant is error of the court in giving certain prejudicial and erroneous instructions to the jury; the defendant points out that in instruction No. 5 the court used the word "affect" death instead of the word "effect" death, and discussed at some length the meaning of the two words. We do not think the use of the word complained of in any way whatever misled the jury, as the jury in all probability did not notice the difference in the pronunciation or the spelling of the word "affect" and "effect."

The defendant further complains of all the other instructions given by the court, and insists that they did not sufficiently cover the facts in this case, and especially does he complain of instruction No. 18. From an examination of the record we fail to find where the defendant submitted any special instructions with a request to the court to give them, covering his theory of his defense. He seems to have relied upon the instructions given by the court and his exceptions to the same. From a careful examination of the instructions given by the court, and considering them in their entirety, we hold they substantially covered the law applicable to the facts in this case. Instruction No. 18, of which the defendant complains, is in substance a copy of an instruction approved by this court in Atchison v. State, 3 Okla. Cr. 295, 105 Pac. 387.

In Moore v. State, 25 Okla. Cr. 118, 218 Pac. 1102, this court in the first paragraph of the syllabus said:

"The instructions must be considered as a whole; no single instruction should be considered to the exclusion of the other instructions given. If, when considered together, the instructions correctly cover the law of the case and are not misleading, confusing, and contradictory, errors or omissions in separate instructions will not constitute reversible error."

This court in a long line of cases has held that, where there is substantial evidence from which the jury would reasonably and logically arrive at a verdict of guilty, it would not set aside the verdict as contrary to the evidence although the testimony might be conflicting. In this case the testimony is conflicting as to what took place at the time the defendant got his gun out of his car and shot the deceased. The jury evidently believed the state's witnesses to the exclusion of those of the defendant. Under the instructions of the court, the jury had an opportunity

to find the defendant guilty of manslaughter in the first degree, but failed to do so, and found him guilty of murder without capital punishment. The jury are the sole and exclusive judges of the witnesses and the weight they will give their testimony, and the court will not disturb the verdict where there is sufficient competent testimony to submit the case to the jury. In this case the defendant was accorded a fair and impartial trial. The instructions of the court substantially covered the law as applied to the facts in this case.

Finding no errors in the record of sufficient merit to warrant a reversal, the judgment of the trial court is affirmed.

EDWARDS, P. J., and CHAPPELL, J., concur.