William R. BURROWS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F-78-40.

Court of Criminal Appeals of Oklahoma.

Jan. 20, 1982.

Robert A. Ravitz, Asst. Public Defender, Oklahoma City, for appellant.

Jan Eric Cartwright, Atty. Gen., David W. Lee, Asst. Atty. Gen., Chief, Criminal Division, C. Elaine Alexander, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Judge:

William R. Burrows, was charged, tried and convicted for the offense of Murder in the First Degree, in the District Court of Oklahoma County, Case No. CRF–77–2769, and was sentenced to death.

On August 1, 1977, William R. Burrows and his spouse were engaged in a domestic dispute arising out of the defendant's drinking problem. When she threatened to leave him and take their eighteen (18) month old son with her, Burrows, according to his confession, seized a .25 caliber Browning semi-automatic pistol, and shot her in their bedroom. He continued to shoot her until she collapsed in the hallway. He then called an ambulance and attended his stricken spouse until she died. Thereafter, Burrows notified his spouse's parents of the incident and requested that they come to Oklahoma City to take care of their grandson. In a second conversation he engaged in a heated argument with his father-in-law.

Additional facts are that:

(1) Police officers investigating the homicide recovered a .25 caliber weapon from the premises, and ballistic reports established that the shots which had been fired into the victim's body had been fired from that weapon.

(2) An autopsy upon the body of Mrs. Burrows established that she was seven and one-half (7½) months pregnant, and that she had died as a result of gunshot wounds.

(3) The defendant, who had been taken into custody at the scene of the murder,

gave a detailed confession to police officers after having been fully advised of his constitutional rights.

(4) During the trial, the investigating officers testified that at the scene, when Burrows was questioned, he was "indifferent, like he didn't care what was going on."

(5) A clinical psychologist, Dr. Krimsky, testified that, in his opinion, the defendant did not know right from wrong at the time he shot his wife. On rebuttal, the State introduced the testimony of Dr. Lorraine Schmidt, who testified that she had examined the defendant after the homicide and that, based upon that examination, it was her opinion that the defendant was capable of distinguishing between right and wrong at the time of the homicide.

## I

In his first assignment of error the defendant contends that the court abused its discretion by refusing to accept a negotiated plea agreement, and requests this Court to set aside the Judgment and Sentence and to remand the cause with instructions requiring the imposition of a life sentence of imprisonment.

■ An agreement was allegedly presented to the presiding criminal judge of the district court and rejected, whereby the defendant would plead guilty to first degree manslaughter, if the State would recommend a life sentence. However, no transcript of the matter has been filed with this Court and the original record contains no motion by the State requesting a reduction of the charge. With no record of the evidence presented by the State or the defendant, if indeed evidence or argument was presented to the presiding judge pursuant to a motion to reduce, this Court cannot infer an abuse of discretion. One who seeks relief from a conviction on appeal has the burden to present sufficient facts to

warrant affirmative relief. *Shipman v. State*, 483 P.2d 761 (Okl.Cr.1971).

■ Further, immediately before trial, the record reveals the State's position as "ready" to present evidence in support of aggravation if the defendant chose to enter a plea of guilty, thereby leaving intact the charge of aggravated Murder in the First Degree. After some discussion (all of which is not contained in the record) the defendant announced ready for trial, unless he was guaranteed a recommendation of life imprisonment by the prosecutor. At that time, the State made no motion to the court orally, or in writing, that it intended to amend the information or strike the bill of particulars. To the contrary, the State emphatically informed the court that it was ready to proceed to present evidence in support of aggravation if the defendant chose to plead guilty. Since the alleged irregularity has not been adequately preserved for appellate review, such is deemed to be waived.

## II

■ In his second assignment of error the defendant contends that five (5) jurors were excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and subsequent court decisions, disallowing the imposition of the death penalty when jurors have been excluded for expressing general objections to capital punishment. In the matter at bar, the trial judge did not use exact language from *Witherspoon* during voir dire. However, it is clear from the questions and answers that the jurors who were excused would not have given proper consideration to the penalties provided by law, and were, under *Witherspoon*, "irrevocably committed, before the trial [had] begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." [1] We find that the five (5) veniremen were

1. The pertinent portions of voir dire examination of those veniremen excused are found in Appendix A.

properly excused for cause under the guidelines set forth in *Witherspoon v. Illinois,* supra.

### III

■ In his third assignment of error the defendant contends that 22 O.S.1971, § 660,[2] is more restrictive than the *Witherspoon* rule, in that a venireman can be excused under Oklahoma law only if he or she could not find the defendant guilty as opposed to being unwilling to consider capital punishment. In *Chaney v. State,* 612 P.2d 269 (Okl.Cr.1980), we addressed a similar argument as the one now before us and stated: "Prospective jurors can ... be excused for cause if they have decided in advance that they will not vote to impose the death penalty, regardless of the circumstances." In accordance with *Chaney,* supra, this assignment of error is without merit.

### IV

■ The contention advanced by the defendant in his fourth assignment of error is likewise without merit. The questioning during voir dire which he now alleges as error was but one question in a set of questions presented by the district attorney. When the questions and answers during voir dire are considered in context we find no error resulting therefrom.[3]

### V

In his next assignment of error the defendant contends that admission of evidence of his deceased wife's pregnancy was error.

■ We agree with the defendant that the fact that the victim was seven and one-half months pregnant at the time of her death was irrelevant during the first stage of the trial, and his motion to exclude such testimony should have been sustained by the trial court. *Combs v. State,* 87 Okl.Cr. 283, 197 P.2d 524 (1948). Under the circumstances of this case the prosecutor should not have introduced the issue of pregnancy until the second stage of the proceedings.[4] When incompetent or irrelevant evidence has been received the entire record must be considered to determine if the evidence contributed to the verdict of guilty. In *Chaney,* supra, the defendant argued that evidence of aggravation was improperly admitted during the first stage of trial, and we determined the same to be harmless and stated that:

> Even had the evidence not been admitted, the verdict of guilty unquestionably would have been the same. Modification is not appropriate since it was proper to admit the evidence in the sentencing stage.

Since evidence of a deceased's condition of pregnancy at the time of the homicide has generally not been held grounds for reversal, standing alone,[5] and has even been

---

**2.** See Appendix B.

**3.** A reading of the voir dire examination reveals a set of questions asked each prospective juror essentially: Whether he or she believed in the concept of punishment for crimes; whether he or she believed that the death penalty could be a deterrent factor; whether he or she could or would be able to assess the death penalty in a proper case; whether he or she would have the courage to impose the death penalty if believed appropriate in the instant case.

With seventeen prospective jurors the district attorney used the word "could". The prosecutor asked two (2) veniremen if they believed they had the courage to vote for the death penalty. With four veniremen the word "would" was used. In questioning all but one of the twenty-three jurors the prosecutor used a properly qualified question: For instance, if

we are able to prove to your satisfaction and beyond a reasonable doubt that this man is guilty of murder in the first degree, would you be able to assess the death penalty? (Tr. 175) On the one occasion that an improper question was asked, the defendant's objection was sustained and the question was withdrawn. We also observe that the defendant asked every prospective juror whether he or she also saw life imprisonment as a deterrent and whether in a proper case he or she could impose life imprisonment as punishment.

**4.** Title 21 O.S.Supp.1980, § 701.12, sets forth aggravating circumstances and in subparagraph four thereof provides:

> The murder was especially heinous, atrocious, or cruel.

**5.** See, for example, *People v. Pendleton,* 24 Ill.App.3rd 385, 321 N.E.2d 433 (1974).

ruled admissible in some jurisdictions,[6] we do not feel that the introduction of such evidence in the case contributed to the finding of guilt.[7]

## VI

■ For the reasons hereinbefore stated, we also hold defendant's next assignment to be without merit. We do hold, however, that the State is estopped from prosecuting the defendant for manslaughter by causing the death of the unborn child.[8] *Chaney v. State*, supra.

## VII

■ Next, the defendant alleges that it was error for the trial court to allow lay witnesses to testify as to ultimate issues bearing on the defendant's state of mind.[9] The complained of testimony, when carefully examined, does not relate to the defendant's state of mind; rather, it was a description of his behavior and reactions, and as such, it was proper. See, *Garcia v. State*, 501 P.2d 1128 (Okl.Cr.1972).

## VIII

■ As his eighth assignment of error the defendant argues that the trial court erroneously permitted the State, on rebuttal, to introduce evidence that an unfinished needlework doily of Raggedy Ann and Andy was found lying on the bed at the homicide scene, and that the admission of such evidence was highly prejudicial to the defendant. Conceding that the admission of this testimony was not relevant to any issues raised during the trial, and had little, if any, probative value, the defendant has failed to demonstrate that he has suffered any prejudice therefrom. We have consistently held that a defendant must show prejudice to warrant reversal or modification on appeal. See, *Frazier v. State*, 607 P.2d 709 (Okl.Cr.1980); and, *Holder v. State*, 556 P.2d 1049 (Okl.Cr.1976). This assignment of error is without merit.

## IX

■ The defendant next contends that the trial court erred in failing to sustain a demurrer to the evidence, since there was no evidence presented that demonstrated a deliberate intention to take a human life. This argument is premised upon the assumption that the jurors were required to believe the defense testimony that, at the time of the commission of the homicide, the defendant was not capable of forming the necessary element of malice aforethought.[10]

---

6. See, *Davis v. State*, 222 Ala. 285, 131 So. 900 (1930).

7. The defense counsel properly preserved the question on the admissibility of the condition of pregnancy by: raising the issue in his motion to limit the testimony of Officer Don Landes, who read the defendant's confession at trial, wherein the defendant had stated that his deceased wife was pregnant, and, entering timely objections during the course of trial, as well as an anticipating objection prior to trial. The fact of pregnancy although established through the defendant's confession, was contained in the autopsy report of Dr. Chapman, in Exhibits 20, 21 and 22 which were requested to be admitted into evidence by defense counsel.

8. Title 21 O.S.1971, § 713, provides that the willful killing of an unborn quick child by any injury committed upon the mother is first degree manslaughter.

9. QUESTION: All right. While you were there, did you observe the defendant?
ANSWER: Yes, sir, I did.

QUESTION: Would you describe his behavior and reactions?
MR. HAMILTON: Your Honor, I object to that. He may not be able to make an opinion as to that.
THE COURT: Overruled.
QUESTION: (By Mr. Joplin) Would you describe his behavior and reaction?
ANSWER: (By the witness) I took his behavior and reactions as normal, but indifferent like he didn't care what was going on.

10. Laws 1976, 1st Exec.Sess., ch. 1, § 1, now 21 O.S.Supp.1980, § 701.7, states:
A person commits murder in the first degree when he unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.
Title 21 O.S.1971, § 703, states:
A design to effect death sufficient to constitute murder may be formed instantly before committing the act by which it is carried into execution.

The court properly instructed the jury on the definition of malice aforethought. The facts and circumstances of the homicide, when coupled with the defendant's confession, his statements to the deceased's parents and the testimony of Dr. Lorraine Schmidt, on rebuttal, relative to the defendant's mental condition at the time of the homicide, amply support the trial court's ruling and the verdict of the jury. Accordingly, the defendant's motion for a directed verdict, verdict of acquittal and his demurrer to evidence were appropriately overruled. See, *Strickland v. State*, 46 Okl.Cr. 437, 287 P. 822 (1930); *Dukes v. State*, 499 P.2d 471 (Okl.Cr.1972), and *Jones v. State*, 479 P.2d 591 (Okl.Cr.1971).

### X

■ In his next assignment of error the defendant contends that a portion of Jury Instruction 13 is essentially the same as the jury instruction condemned by the United States Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). An examination of the instructions as a whole, and a comparison of the instructions complained of, leads us to conclude that unlike the instruction in *Sandstrom*, supra, the jury in the instant case fully understood that the State had the burden of proving each and every allegation of the complaint beyond a reasonable doubt. The instructions in the present case are in substantial accord with those approved and distinguished from *Sandstrom*, in the very excellent opinion by the Kansas Supreme Court in *State v. Acheson*, 3 Kan.App.2d 705, 601 P.2d 375 (1979). In accordance with *Acheson*, supra, we are of the opinion that this assignment of error is without merit.

### XI

■ In his eleventh assignment of error the defendant attacks the court's instructions to the jury covering the issue of sanity. In reviewing the record we find that no objection to that part of the charge to the jury was made by the defendant.[11] The exception by defendant to the court's ruling was in regard to his requested Jury Instruction No. 5,[12] which was properly refused. The argument presented regards the failure of the trial court to instruct the jury pursuant to defendant's requested Jury Instruction No. 3.[13] Jury Instruction No. 15 [14] is in accord with this jurisdiction's

11. The record reflects the following:

THE COURT: Let the record reflect that both sides have been furnished copies of the verdict forms and the court's instructions. What says the State?

MR. COATS: The State has no objections to the forms of verdicts or to the instructions as submitted.

THE COURT: Thank you, sir. What says the defendant?

MR. HAMILTON: The defendant has no objections to the verdict forms or the instructions. I would like to note my one requested instruction that was not given. I would like to have an exception to that.

THE COURT: Certainly. They have been marked as such and made a part of the file.

MR. MILLER: I believe it should be signed by the objector and the court to complete the record.

THE COURT: All right. I will do that.

12. Defendant's proposed jury instruction 5 provided:

A person who is not conscious of the act he is committing at the time he commits it is not punishable therefore.

13. Defendant's proposed jury instruction 3 provided:

The legal presumption of sanity of an accused will prevail until evidence is introduced sufficient to raise a reasonable doubt of the defendant's sanity at the time of the commission of a crime. When this is done the presumption of sanity ceases and the burden of establishing the sanity of the defendant is on the State, which must then prove his sanity beyond a reasonable doubt.

14. In pertinent part, the Instruction 15 provided:

The defendant has interposed the defense of insanity. You are instructed that the law of the State of Oklahoma sets the test of criminal responsibility for committing a criminal act at a point where the accused has a mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act. An act done by a person in a state of insanity cannot be punished as a public offense. Nor can a person be tried, adjudged to punishment or punished for a public offense, while he or she, as the case may be, is

test for determining criminal responsibility of an accused, which is commonly referred to as the *M'Naghten* rule. The instructions are in accord with this Court's decisions in *Revard v. State*, 332 P.2d 967 (Okl.Cr.1958), and *Dare v. State*, 378 P.2d 339 (Okl.Cr. 1963), wherein this Court approved similar instructions as appropriate and proper in cases of criminal responsibility on pleas of insanity. See also, *Dukes v. State*, supra.

We have carefully examined the instructions covering the issue of insanity and are convinced that they fairly presented the issues involved.

## XII

The next contention urged by the defendant is that the trial court erroneously restricted Dr. Krimsky by not allowing him to fully testify to all facts revealed to him by the defendant during an interview session which lasted some five and one-half hours. As a result thereof, defendant maintains that the jury was unable to understand the basis for Dr. Krimsky's opinion that the defendant was unable to distinguish right from wrong at the time he shot and killed his wife.

 The one single objection which the defendant now contends restricted Dr. Krimsky from presenting facts upon which he formed his opinion is not supported by the record. The doctor was allowed great latitude in presenting not only an abundance of facts but the conclusions to which they led him. This assignment of error is without merit.[15]

## XIII

The next contention raised by the defendant is that portions of the closing argument presented by the prosecutor during the punishment phase of the trial were impermissible, necessitating modification of sentence.

 We have repeatedly stated that a defendant must not only object to improper statements, but must also move that they be stricken from the jury's consideration unless the remarks were of such character that the error would not be cured by a withdrawal thereof. In the absence of such an objection, and a motion to exclude, the contention that the argument was prejudicial and inflammatory cannot be presented for the first time on appeal. *Neal v. State*, 506 P.2d 936 (Okl.Cr.1973); and *Jones v. State*, 555 P.2d 1061 (Okl.Cr.1976).

We have carefully reviewed not only the comments of the prosecutor now alleged as improper, but the closing arguments in toto. We disagree with defense counsel's contention that the remarks were irregular and prejudicial; to the contrary, the comments were proper comments on the evidence and bearing on the very issues with which the jury was concerned. The right of argument contemplates a liberal freedom of speech and the range of discussion, illustration, and argumentation is wide. *Harvell v. State*, 395 P.2d 331 (Okl.Cr.1964). Counsel for both the State and the defendant have a right to discuss fully, from their standpoint, the evidence and the inferences and deductions arising from it. *McDonald v. State*, 553 P.2d 171 (Okl.Cr.1976); *Bell v. State*, 381 P.2d 167 (Okl.Cr.1962).

 We are of the opinion that the prosecutor's remarks did not deprive defendant of his constitutional right to a fair and impartial trial and were reasonable arguments supported by the record. We, therefore, find this assignment of error to be without merit.

## XIV

The defendant, in his next two assignments of error, attacks the aggravating cir-

insane; but where in any criminal action by indictment or information the defense of insanity is interposed either singly or in conjunction with some other offense, the jury must state in the verdict, if it is one of acquittal, whether or not the defendant was acquitted on the grounds of insanity . . .

Jury Instruction No. 16 provided:
Should you find that the offense of insanity as defined in these instructions, has been established, then you will find the defendant not guilty by reason of insanity.

**15.** See Appendix C.

cumstance that the killing of his wife was especially heinous, atrocious or cruel. In support thereof, he argues that the provision is vague and overbroad and, if deemed constitutional, is unsupported by the evidence.

■ As defendant concedes, an aggravating circumstance that an offense committed is especially heinous, atrocious or cruel, is *not* unconstitutionally vague and overbroad, as previously determined by the United States Supreme Court in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). See also, *Chaney v. State*, supra.

The trial court instructed the jury in Instruction No. 9 as follows:

> You are further instructed that the term 'heinous', as that term is used in these instructions means extremely wicked or shockingly evil, and that 'atrocious' means outrageously wicked and vile; and 'cruel' means designed to inflict a high degree of pain, utter indifference to or enjoyment of the suffering of others; pitiless.

In *Eddings v. State*, Okl.Cr., 616 P.2d 1159 (1980), quoting *State v. Dixon*, 283 So.2d 1 (Fla.1973), we stated:

> It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or enjoyment of the suffering of others. *What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.* (Emphasis added.)

In the recent decision of *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court of the United States invalidated a Georgia conviction for aggravated murder premised upon the circumstance that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." [16] Although upheld in *Gregg v. Georgia*, supra, as not being unconstitutional on its face, the Court determined, as applied to the facts in *Godfrey*, that the Georgia Supreme Court failed to apply a constitutional construction of the statute as marked by earlier decisions of that Court.[17] As noted in the body of the opinion, the victims were killed *instantaneously*, and although the scene was quite gruesome, a shotgun having been used, there was no evidence of mental or physical torture preceding the killings, or any physical or mental suffering whatsoever. Once again, the Supreme Court has reiterated the requirement that a capital sentencing scheme must provide a meaningful basis for distinguishing the few cases in which the penalty is imposed from the many cases in which it is not.

Turning to the instant case, we note that throughout his brief defense, counsel continually alluded to the fact of the deceased's condition of pregnancy as being an inappropriate matter in consideration of the enhanced punishment of death. I disagree.

The defendant opened a closet door, reached in and took from a jacket pocket a .25 caliber Browning semi-automatic pistol and commenced shooting his wife. In the room was the mother's eighteen (18) month old son. Upon being shot the deceased began to make her way from the bedroom to the living room.[18] She was shot again. The defendant shot the deceased at least one time in the master bedroom, and at least twice while she was in the hallway. Altogether, the deceased was shot a minimum of four times; the autopsy report

---

16. Georgia Cod.Ann., § 27–2534.1(b)(7).

17. See Footnotes 10 through 14, *Godfrey v. Georgia*, 100 S.Ct. 1766, 1769.

18. Blood was discovered in the hallway, bedroom and living room of the home by the investigating police officer.

reveals gunshot entries to the lower left back, lower middle back, upper right middle back, upper left chest and left hand. (This entry may have been caused by the same shot.) Throughout the shooting episode the defendant was holding his child. The deceased stumbled into the front room of the home and came to rest adjacent the front door. Although she did not linger a long while, she did not die immediately; and as she lay there, the life she carried, she knew, would die also.[19] The evidence amply supports the jury finding that the murder was aggravated by the circumstances of being an especially heinous killing.

## XV

■ Next, the defendant contends that 21 O.S.Supp.1980, § 701.12(2), (the accused knowingly created a great risk of death to more than one person) is overly broad and therefore unconstitutional. While defendant's argument may have, at one time, been worth discussion, the validity of this circumstance, on its face, has been settled by the United States Supreme Court in *Proffitt v. Florida*, supra, wherein the following is determination of this issue:

In the only case, except for the instant case, in which the third aggravating factor—'[t]he defendant knowingly created a great risk of death to many persons'—was found, *Alvord v. State*, 322 So.2d 533 (1975), the State Supreme Court held that the defendant created a great risk of death because he 'obviously murdered two of the victims in order to avoid a surviving witness to the [first] murder'.

**19.** In Delaware the fact of the victim's pregnancy is itself an aggravating circumstance. See 11 Del.C., § 4209(e)(1)(q).

**20.** During the second stage, in pertinent part, the jury was instructed:
You are instructed that mitigating circumstances are not specifically enumerated in the statutes of this State but the law of this state sets up certain minimum mitigating circumstances you shall follow as guidelines in determining which sentence you impose in this case. You shall consider any or all of these minimum mitigating circumstances which you find apply to the facts and circumstances of this case. You are not limited in your consideration to these minimum mitigating

[footnote omitted] *As construed by the Supreme Court of Florida, these provisions are not impermissibly vague.* (Emphasis added).
Title 21 O.S.Supp.1980, § 701.12(2), is constitutional.

## XVI

In three other arguments, the defendant contends that errors occurred in the Court's instructions during the second stage of the proceedings.

■ Title 21 O.S.Supp.1980, § 701.12, sets forth the aggravating circumstances. Section 701.10 provides that evidence of any aggravating circumstance may be presented provided the defendant has been adequately put on notice. Title 21 O.S.Supp.1980, § 701.11, prohibits a sentence of death unless at least one of the aggravating circumstances is found to exist and is supported by the evidence. The penalty of death, however, cannot be imposed if mitigating circumstances outweigh aggravating circumstances. Section 701.10 states: "Evidence may be presented as to *any mitigating* circumstances." (Emphasis added.) This means that a defendant may present any relevant evidence within the limitation of the rules of evidence, bearing on his character, prior record or circumstances of the offense. During the second stage, the Judge instructed the jury that they were not limited in their consideration of mitigating circumstances, but could consider any such circumstances that they found from the evidence.[20]

circumstances, if any, you find from the evidence in this case. What are and what are not additional mitigating circumstances is for you the jury to determine.
The following are the minimum mitigating circumstances as provided by law:
1. The defendant has no significant history of prior criminal activity;
2. The age of the defendant at the time of the crime.
Instruction No. 6 provided:
You are instructed that in the event you unanimously find that one or more of these aggravating circumstances existed beyond a reasonable doubt, then you would be authorized to consider imposing a sentence of death.

▇ The defendant's twenty-first assignment of error is, in part, identical to the argument presented in our recent decision of *Irvin v. State*, 617 P.2d 588 (Okl.Cr.1980). Arguing from Laws 1976, 1st Extraordinary Session, Chapter 1, Section 5, now 21 O.S. Supp.1980, § 701.11, defendant claims that the jurors must be told four things prior to beginning deliberations. First, the death penalty cannot be imposed unless the jury finds one or more aggravating circumstances beyond a reasonable doubt; second, if the jury finds one or more aggravating circumstances, then they may consider imposing the death penalty; third, if the jury finds one or more aggravating circumstances, but the circumstances are outweighed by mitigating circumstances of the case, the jury cannot impose the death penalty; fourth, even if the jury finds aggravating circumstances, and those circumstances are not outweighed by mitigating circumstances, they can decline to impose the death penalty. In the defendant's case, the jury was given the first three instructions but not the fourth. As in *Irvin*, the argument is rejected. The fourth instruction was subsumed in the second, since the jurors were told that they could, not that they *had to*, impose the death sentence. As stated in *Irvin* :

> The only discretion provided the jury under the statute [21 O.S.Supp.1980, § 701.-11] is that necessary to make a factual finding of the existence or non-existence of aggravating and mitigating circumstances, as well as the discretion requisite in balancing the two.

A careful reading of the statute in conjunction with the instructions given the jury reflects compliance with Oklahoma law, and

> If you do not unanimously find beyond a reasonable doubt one or more of the statutory aggravating circumstances existed, then you would not be authorized to consider the death penalty of death. In that event the sentence would be imprisonment for life. If you do unanimously find one or more of these aggravating circumstances existed beyond a reasonable doubt and you further find that such aggravating circumstance or circumstances is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed. In that

I find the arguments presented by the defendant without merit.

## XVII

▇ The defendant also contends that the jury should have been told that if they could not agree on a sentence in a reasonable time, then they would be dismissed and a life sentence imposed. Defendant is concerned that jurors with strong character could have overwhelmed jurors of weaker character. This same argument was made in *Frazee v. State*, 79 Okl.Cr. 224, 153 P.2d 637 (1944), wherein we stated in the Syllabus as follows:

> It is the duty of jurors to reason together and harmonize their discordant views where possible. A juror should not consent to a verdict which he thinks is contrary to the evidence out of a mere deference to his fellow jurors. Yet, he may consider whether the doubt which he entertains is a reasonable one which makes no impression on the minds of others equally honest and equally intelligent with himself, who have heard the testimony out of which the doubt arises, and he may properly change his views because of this consideration. He can properly doubt the correctness of his own opinion when it is not concurred in by his fellow jurors, and may without a violation of his oath, consent to a verdict which, if he were acting alone, would not render. Trial Court may properly refuse a requested instruction by defendant which is so worded that it is an invitation to the jury to disagree on its verdict.

## XVIII

▇ The defendant next attacks Oklahoma's death penalty as being both cruel

event the sentence would be imprisonment for life.
Instruction No. 10 provided:
> You are instructed that the state has the burden to prove to your satisfaction, beyond a reasonable doubt, the existence of one or more statutory aggravating circumstances as set out in these instructions.

> The jury was also instructed that the sentence would be life imprisonment if they found no aggravating circumstances or if mitigating circumstances outweighed aggravating circumstances found.

and unusual in that it denies due process and equal protection of the law. He does not challenge the death penalty in principle, that question having been resolved by the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The essence of his argument is cumulative to other attacks previously made in his brief, and in a rather shotgun approach, he contends additionally that the discretion which is inherent in any capital sentencing procedure is impermissible due to the very make-up of a criminal justice system. These types of arguments have been addressed and rejected. In *Gregg*, supra, the Supreme Court stated:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman* [*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346], in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.

We reject the arguments and deem them without merit. *Proffitt v. Florida*, supra; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

### XIX

■ The twenty-third assignment of error is based on *Commonwealth v. O'Neal*, 367 Mass. 440, 327 N.E.2d 662 (1975), and *Commonwealth v. O'Neal*, 369 Mass. 242, 339 N.E.2d 676 (1975). The gist of these opinions is that the right to life is a funda-mental right protected by the Fourteenth Amendment to the United States Constitution and that before a state can infringe upon that right by imposing the death penalty, it must be shown that there is a compelling state interest which cannot be satisfied by any less restrictive means. Since *O'Neal* was decided, the United States Supreme Court ruled in *Gregg v. Georgia*, supra. In that ruling the Supreme Court held that the death penalty is not unconstitutional in principle, and concerning the test to be applied stated:

> [W]hile we have an obligation to insure the Constitutional bounds are not overreached, we may not act as judges as we might as legislators.... Therefore, in assessing a punishment selected by a democratically elected Legislature against the constitutional measure, we presume its validity. We may not require the Legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. The heavy burden rests on those who would attack the judgment of the representatives of the people.

The Supreme Court of the United States did not overlook *O'Neal*, in making their decision; they simply did not follow it.

### XX

In his next assignment of error, the defendant contends that his lawyer's mistakes at trial significantly contributed to the sentence. We have examined the record in this case and have given careful consideration to the argument of counsel presented in briefs and during oral argument.

■ Under whatever test is applied the defendant's lawyers did a good job in representing their client zealously and most competently. The established rule in this jurisdiction, that effective assistance of counsel must be evidenced by a determination of whether or not the purported representation was a sham, has been recently changed to adhere to the mandate, that the Sixth Amendment demands, that defense

counsel exercise the skill, judgment and diligence of a reasonably competent defense attorney. *Dyer v. Crisp*, 613 F.2d 275 (10th Cir. 1980). Oklahoma has adopted the *reasonably competent assistance of counsel* standard to be applied prospectively upon review of criminal cases in this state. *Johnson v. State*, 620 P.2d 1311 (Okl.1980). We do not agree with appellate counsel that the record supports the contention that trial counsel (defendant was represented through trial by two (2) attorneys) failed to exercise adequate skill, judgment and diligence under the test.

For the reasons heretofore stated, the Judgment and Sentence finding the defendant guilty of First Degree Murder is AFFIRMED. Recognizing that both of my colleagues agree that the sentence should be modified to life imprisonment, I respectfully dissent to the modification and the sentence from death to life imprisonment, for the reason that, in my opinion, the evidence amply supports the finding of aggravating circumstances in the instant case, and the mitigating circumstances were not such as to outweigh the aggravating circumstances. I would affirm the sentence of death.

### APPENDIX A

THE COURT: Ms. Soto, we will get back to you in just a minute. I have read the statute to you concerning this case. Keeping in mind the presumption of innocence the burden of proof. Now, in a case where the law and the evidence warrants in a proper case under the proper facts and circumstances could you all without doing violence to your conscience agree to a verdict imposing the death penalty.

PROSPECTIVE JUROR: I couldn't.

THE COURT: All right. Ms. Soto, you cannot and Mr. Foreman you cannot. Ms. Soto, let me ask you this question. If you found, Ms. Soto, beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree and if under the evidence and the facts and circumstances of the case the law would permit you to consider a sentence of death are your reservations about the death penalty such that regardless of the law the facts and circumstances of the case you would not inflict the death penalty?

PROSPECTIVE JUROR: I don't think I could sleep at night, Judge Naifeh.

THE COURT: Yes, ma'am. Your answer should be yes or no.

PROSPECTIVE JUROR: I don't think I could.

THE COURT: Your answer is no?

PROSPECTIVE JUROR: No.

THE COURT: And that is a positive no?

PROSPECTIVE JUROR: Yes.

THE COURT: In other words, Ms. Soto, if you found beyond a reasonable doubt that the defendant, Mr. Burrows, is guilty of Murder in the First Degree you wouldn't inflict the death penalty?

PROSPECTIVE JUROR: No.

MR. COATS: Your Honor, we move that Ms. Soto be excused for cause.

THE COURT: Any objections?

MR. HAMILTON: Yes, Your Honor.

THE COURT: Approach the Bench, please.

MR. HAMILTON: Your Honor, I feel that solely because Ms. Soto could not give a death penalty upon the finding of guilty of Murder in the First Degree is not grounds for her being excused for cause because of the fact that my client is entitled to a fair and impartial trial by a Jury by his peers. And the fact is the people of Oklahoma County may not be willing to give a death penalty.

She did indicate she was unsure. But finally did she change her mind to say she was sure. I feel that the Court should examine her more as to whether or not she feels the death penalty would not be given because of her religious or moral reasons.

THE COURT: Any one of you would like to ask her any further questions?

MR. COATS: It seems to me in answer to the questions that Your Honor has asked disposes of the question. Under current law both Federal and State law we are

entitled to have a Jury who could under proper circumstances inflict the death penalty. You asked her under any circumstances she said she could not. I would just ask that she be excused. When this situation again occurs the State would have no objection to giving the defense a continuing objection on these grounds.

MR. HAMILTON: Your Honor, I feel that the Jury should be a fair cross section of the community and excusing Ms. Soto for that reason is improper.

THE COURT: All right. The objection is overruled you are allowed exceptions and you may have a continuing objection on other Jurors if you wish.

MR. HAMILTON: I do wish, Your Honor.

THE COURT: Ms. Soto, you understood my questions, did you not?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: You understood your answers that you gave?

PROSPECTIVE JUROR: Yes sir.

THE COURT: Ms. Soto, I am going to excuse you for cause at this time. If you will come and get your slip and thank you so much for serving as a Juror. Call the next.

* * * * * *

THE COURT: Mr. Foreman.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: I want you to listen very attentively to this question. It's a long question but I have to word it in this manner. If you found beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death are your reservations about the death penalty such that regardless of the law, facts and circumstances of the case you would not inflict the death penalty?

PROSPECTIVE JUROR: Positively, no, sir.

THE COURT: In other words, you're telling me your reservations about the death penalty are such that you would not inflict the death penalty?

PROSPECTIVE JUROR: I would not.

THE COURT: Even if you found him to be guilty beyond a reasonable doubt.

PROSPECTIVE JUROR: I would not.

THE COURT: You wouldn't even consider it?

PROSPECTIVE JUROR: I would not.

THE COURT: You realize as a Juror that the Jury has the discretion to consider either death or life you understand that?

PROSPECTIVE JUROR: I understand that, sir.

THE COURT: You have understood my questions?

PROSPECTIVE JUROR: I have understood all your questions.

THE COURT: And you have understood your answers?

PROSPECTIVE JUROR: I do.

THE COURT: Mr. District Attorney do you have any questions?

MR. COATS: No, Your Honor, we move that Mr. Foreman be excused for cause.

THE COURT: Do you have any objections?

MR. HAMILTON: Yes, Your Honor.

THE COURT: Same objection?

MR. HAMILTON: Yes, sir, Your Honor.

THE COURT: All right. Same ruling. It will be overruled with exceptions. Mr. Foreman, sir, you are excused. If you will come and get your slip you will be assigned to another case. You are to report back to the jury assembly room on the 5th floor. Thank you so much for serving.

* * * * * *

THE COURT: Mr. Harrington, what is your business, profession or occupation, please, sir.

PROSPECTIVE JUROR: I am general superintendent for the Smith and—

THE COURT: Were you able to hear all the questions I propounded so far?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Would your answers to any of those questions be materially different from these others?

PROSPECTIVE JUROR: I don't believe in capital punishment.

THE COURT: All right. Let me ask you this. In a case where the law and the evidence warrants in a proper case could you without doing violence to your conscience agree to a verdict imposing the death penalty?

PROSPECTIVE JUROR: No, sir, I could not give the death penalty.

THE COURT: Let me ask you this additional question, please, sir. If you found beyond a reasonable doubt that the defendant, Mr. Burrows, was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death are your reservations about the death penalty such that regardless of the law, facts and circumstances of the case you would not inflict the death penalty?

PROSPECTIVE JUROR: No, sir, I don't believe in the death penalty.

THE COURT: And your reservations are such about the death penalty that you could not impose it even if you found the defendant to be guilty beyond a reasonable doubt; is that correct?

PROSPECTIVE JUROR: Yes, sir.

MR. COATS: The State moves that Mr. Harrington be excused.

THE COURT: Mr. Harrington, you are excused.

\* \* \* \* \* \*

THE COURT: All right. Have a seat, please. Ms. Peters, you have something to call to my attention?

PROSPECTIVE JUROR: I don't believe in capital punishment.

THE COURT: All right. Ms. Peters let me ask you this question. Listen very attentively if you will. In a case where the law and evidence warrants and in a proper case could you without doing violence to your conscience agree to a verdict imposing the death penalty?

PROSPECTIVE JUROR: I wouldn't vote for the death penalty. Life I would. Not the death penalty.

THE COURT: Let me ask you this. If you found beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of death are your reservations about the death penalty such that regardless of the law and the facts and circumstances of the case you would not inflict the death penalty?

PROSPECTIVE JUROR: I would not.

THE COURT: Your answer to that question then that your reservations are such that you would not inflict the death penalty?

PROSPECTIVE JUROR: Yes.

THE COURT: You understood the questions I have asked you?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: You understood the answers you have given to me?

PROSPECTIVE JUROR: Yes, sir.

MR. COATS: The State moves Ms. Peters be excused.

THE COURT: All right.

MR. HAMILTON: Your Honor, I would like to ask Ms. Peters one question if I could.

(WHEREUPON, some discussion was had at the Bench outside the hearing of the Jury and off the record.)

THE COURT: All right.

MR. HAMILTON: Ms. Peters, I would like to ask you is there any type of case—

THE COURT: Sir, either use the podium or stand right there.

MR. HAMILTON: Ms. Peters, is there any type of case in which you could give the death penalty, any type of case at all?

PROSPECTIVE JUROR: No, there is not.

THE COURT: Ms. Peters, you are excused and thank you for your frankness.

\* \* \* \* \* \*

THE COURT: Keeping in mind the presumption of innocence doctrine and the predicate we have laid before, let me ask you this question. Mr. Holmes, in a case where the law and the evidence warrants in a proper case could you without doing violence to your conscience agree to a verdict imposing the death penalty?

PROSPECTIVE JUROR: No, sir, I could not.

THE COURT: Let me then ask you this question. If you found beyond a reasonable doubt that the defendant was guilty of Murder in the First Degree and if under the evidence, the facts and circumstances of the case the law would permit you to consider a sentence of death are your reservations about the death penalty such that regardless of the law, the facts and the circumstances of the case you would not inflict the death penalty?

PROSPECTIVE JUROR: No, sir, I would not.

THE COURT: In other words, your reservations about the death penalty are such that you would not inflict the death penalty?

PROSPECTIVE JUROR: Yes, sir. I believe it has a place but it's not my place to do it.

THE COURT: All right.

MR. COATS: We move that he be excused for cause, Your Honor.

THE COURT: Sustained.

## APPENDIX B

Title 22 O.S.1971, § 659, provides:

Particular causes of challenge are of two kinds:

1. For such a bias as when the existence of the facts is ascertained, in judgment of law disqualifies the juror, and which is known in this chapter as implied bias.

2. For the existence of a state of mind on the part of the juror, in reference to the case, or to either party, which satisfies the court, in the exercise of a sound discretion, that he cannot try the issue impartially, without prejudice to the substantial rights of the party challenging, and which is known in this chapter as actual bias. [Footnote omitted]

Title 22 O.S.1971, § 660, provides:

A challenge for implied bias may be taken for all or any of the following cases, and, for no other:

1. Consanguinity or affinity within the fourth degree, inclusive, to the person alleged to be injured by the offense charged or on whose complaint the prosecution was instituted, or to the defendant.

2. Standing in the relation of guardian and ward, attorney and client, master and servant, or landlord and tenant, or being a member of the family of the defendant, or of the person alleged to be injured by the offense charged, or on whose complaint the prosecution was instituted, or in his employment on wages.

3. Being a party adverse to the defendant in a civil action, or having complained against, or been accused by him in a criminal prosecution.

4. Having served on the grand jury which found the indictment, or on a coroner's jury which inquired into the death of a person whose death is the subject of the prosecution.

5. Having served on a trial jury which has tried another person for the offense charged in the indictment or information.

6. Having been one of the jury formerly sworn to try the indictment or information and whose verdict was set aside, or which was discharged without a verdict, after the cause was submitted to it.

7. Having served as a juror in a civil action brought against the defendant for the act charged as an offense.

8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror.

## APPENDIX C

A review of Dr. Krimsky's testimony does not reflect that he was unduly restricted

from presenting the facts upon which he formed his opinion. To the contrary, the doctor explained that there was no main figure with whom the defendant identified. The defendant was estranged from his father who was portrayed to him as an alcoholic by his mother and his grandmother. The defendant was an only child who was reared by his mother and his grandmother, his parents having been divorced when the defendant was quite young. The defendant called his mother "Judy" and, at age 18, having completed highschool, planned to move to Houston, live with his uncle and aunt and work as a pipefitter. Upon this revelation Judy, the defendant's mother, threatened to have the defendant treated as a runaway if he attempted to go to Houston. Thus, defendant's plan was aborted. The doctor testified that defendant's mother could not tolerate being separated from her son. Thereafter however, the defendant joined the air force, completed four years of college, and worked for the government and pursued a master's degree. He made good grades but began drinking. The picture Dr. Krimsky gained from the defendant was one in which things remained formalized with little involvement. Although bright and well-behaved, Dr. Krimsky explained that the defendant had no close friends and would not confide in relationships nor was he able to develop close friendships. Because the defendant was constantly reminded that men were not trustworthy by his mother and his grandmother he was scared when he became an adult. Krimsky further stated to the jury that the prevailing trend in the defendant's life was to veer downward from reality although the ability to appear controlled was apparent. Krimsky told the jury that the defendant was quite inhibited and very guarded. The defendant's relationship with his son was very secure and because he was deprived of this type of relationship with his own father made the relationship between himself and his son most important. Krimsky told the jury that the threat by defendant's wife to deprive him of his son in view of his background pushed the defendant into a state of rage and panic. Based thereon, Krimsky's opinion was that the defendant could not distinguish right from wrong when he killed his wife. Krimsky stated that at that very moment, the defendant's wife was but a silhouette having no substance.

BRETT, Presiding Judge, dissenting, but concurring in modification of sentence:

Although I agree with my colleagues that the appellant cannot now be charged with the death of the unborn child, I cannot agree with their treatment of several other issues in this case. As I have stated in previous cases (See *Assadollah v. State*, 632 P.2d 1215 (Okl.Cr.1981), Brett, P. J., Concurring in Part and Dissenting in Part, and *Hall v. State*, 635 P.2d 618 (Okl.Cr.1981), Brett, P. J., Dissenting) I do not believe that the ruling of the United States Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), can be so lightly brushed aside. However it is discussed, the point of *Sandstrom* is that in a criminal case the burden is on the State to prove each and every element of the crime charged, and the State may not be relieved of that burden by requiring the defendant to prove that an element was not present. In the present case, two of the trial court's instructions improperly shifted the burden of proof.

The last sentence of Instruction No. 13 (on intent) is: "The law presumes that every person who has reached the age of discretion is accountable for all of his acts, *and the law also presumes that every sane person contemplates and intends the necessary and natural consequences of his own acts.*" (Emphasis added) The instruction which caused reversal in *Sandstrom v. Montana*, supra, was: "The law presumes that a person intends the ordinary consequences of his voluntary acts." In my opinion the slight difference in wording is inconsequential. And, I cannot say from reading the instructions as a whole that the jury clearly understood the appellant was not required to prove he did not intend to kill his wife.

In his eleventh assignment of error the defendant says the jury was not instructed

that the State had the burden of proof on insanity. He filed a requested instruction, which the trial court indicated was given in substance; but while the jury was told several times that the State had the burden of establishing the defendant's guilt beyond a reasonable doubt, they were never told that if the defendant raised a question as to his sanity the State had to prove that sanity beyond a reasonable doubt. The court's instruction on sanity is No. 15 (quoted in part in the opinion by Judge Bussey). The jury is given the correct test of sanity ("... a mental capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and consequences of such act...."). But the last sentence of the instruction (not quoted by Judge Bussey) was unfortunate: "*Should you find that the defense of insanity* as defined in these instructions, *has been established*, then you will find the defendant not guilty by reason of insanity." (Emphasis added). The problem with this instruction is clear: the burden was placed on the appellant to prove his insanity.

Both of the above instructions raise serious problems. I recognized that the set of instructions must be read as a whole; but in doing so, I do not find a strong enough emphasis on the State's burden of proof to enable me to say that these two instructions did not cause fatal error.

In presenting his insanity defense the defendant called a clinical psychologist who testified that in his expert opinion the defendant did not know right from wrong at the time he pulled the trigger. During his testimony the doctor repeatedly tried to tell the jury about the background information that was the basis of his opinion, but he was repeatedly blocked by the State's objections. The defendant says the doctor should have been able to give this information to the jury so that they could properly judge his credibility.

The defendant's citations are persuasive. From *Toms v. State*, 95 Okl.Cr. 60, 239 P.2d 812 (1952), comes the following syllabus:

Expert testimony is admissible where the conclusions to be drawn by the jury depend on the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men to speak with authority thereon, and in those cases in which the conclusions to be drawn from the facts stated, as well as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence. *In such cases not only the facts but the conclusions to which they lead, may be testified to by qualified experts.* (Emphasis added).

By a reverse implication it would seem that the expert can testify to the facts as well as to the conclusions.

The defendant also cites *Fuller v. Lemmons*, 434 P.2d 145 (Okl.1967), in which the Oklahoma Supreme Court was concerned with the testimony of a medical expert. After stating that "[a] medical expert must always predicate his opinion on certain premises of fact," the Court held it error that the x-ray photographs on which the expert's testimony was based were not admitted into evidence. That is, in relation to the present case, that the jury was not given the facts on which the opinion was based.

The State's argument, on the other hand, seems based on a misunderstanding of the case. *Owens v. Oklahoma Turnpike Authority*, 283 P.2d 827 (Okl.1955), involved asking hypothetical questions of an expert concerning matters about which he had no firsthand knowledge. *Fidelity and Casualty Company of New York v. Hendrix*, 440 P.2d 735 (Okl.1968), and the cases on which it is based involve police reports based on the hearsay statements of witnesses.

Neither of these cases fits the case now before the Court. (The defendant also cites *Fidelity and Casualty Company of New York*, but it is no more to the point for him than it is for the State.) Statements made by a defendant to a doctor are not pieces of hearsay which the doctor merely adopts and passes along to the jury. They are the raw material out of which he fashions his product—the psychological profile. As with

*Fuller v. Lemmons,* supra, where the jury should have been given the x-ray photographs, the jury should have been given the defendant's statements to the doctor so they could properly judge the doctor's credibility.

For the same reason this is not a case in which hypothetical questions were needed, because the doctor had firsthand knowledge of the material facts: namely, the defendant's background. (Whether or not he had *sufficient* knowledge of the defendant's background to form a reliable opinion was a matter to be explored on cross-examination, which the district attorney did very well.)

The State cites 12 O.S.Supp.1980, § 2705, (which, of course, was not in effect at the time of the trial of this case), and Cleary, *McCormick on Evidence,* 2nd Ed. (1972), for the proposition that the facts underlying an expert's opinion can only be adduced on cross-examination. This is not correct. Both the statute and the treatise state that an expert "may" give his or her opinion without prior disclosure of the underlying facts.

Finally, I would hold that on the facts in this case, the State failed to present sufficient evidence of malice aforethought, meaning that the appellant's demurrer should have been sustained. The proof was that the shooting occurred during a heated argument between the appellant and his wife. It was when she threatened to divorce him and take their child, whom he would never again see, that he grabbed the pistol and started shooting.

■ Because of the above errors of law, I would reverse this case for a new trial. Nevertheless, in view of the positions of my colleagues, it is clear that a reversal of this conviction is out of the question. I therefore concur with Judge Cornish that the sentence should be modified to life imprisonment. In addition to the mitigating circumstances discussed by Judge Cornish, the facts indicate that the appellant felt remorse after the shooting. He called an ambulance and attempted to attend to his wife until it could come; and he called the police after she died.

CORNISH, Judge, concurring in part and dissenting in part:

I concur with Judge Bussey's opinion insofar as it affirms the judgment of guilt reached by the jury at the end of the first stage proceeding. However, I am not unmindful of the responsibility given to the members of this Court by the Legislature, in addition to reviewing legal errors, to consider the propriety of the sentence imposed under 21 O.S.Supp.1980, § 701.13 C:

C. With regard to the sentence, the court [The Court of Criminal Appeals] shall determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

2. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in this act; and

3. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the *defendant.* [Emphasis supplied.]

In a capital case the appellant is entitled to have the validity of his conviction appraised on considerations of the case as it was tried and as the issues were determined in the trial court. That fundamental principle of procedural fairness applies with no less force to the penalty phase of a trial in a capital case than it does in the guilt-determining phase. *Spinkellink v. Wainwright,* 442 U.S. 1301, 99 S.Ct. 2091, 60 L.Ed.2d 649 (1979), citing *Presnell v. Georgia,* 439 U.S. 14, 99 S.Ct. 235, 58 L.Ed.2d 207 (1978). Accordingly, it is this Court's duty, where the evidence supports at least one statutory aggravating circumstance, to weigh that against the mitigating factors instructed by the court, as well as against any additional factors made known to the jury at trial. Merely to find that capital punishment was factually supported or justified by the evidence does not rise to the separate and independent judgment required of the reviewing court in death penalty cases. It is incumbent upon this Court to ensure that

the death penalty is evenly enforced and not inflicted in an arbitrary and capricious manner. *Godfrey v. Georgia,* 446 U.S. 429, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980).

Furthermore, I interpret *Godfrey v. Georgia, supra,* to mandate the death penalty be reserved only for the most aggravating of circumstances, circumstances that are so shocking or repugnant that the murder stands out above the norm of first degree murders.

█ This writer concedes that the statutory aggravating circumstance, "the murder was especially heinous, atrocious, or cruel," is constitutional and is supported by the evidence. However, I do not find persuasive the conclusion reached by the jury and the majority opinion which states that the evidence supports the second aggravating circumstance, *i.e.,* "the defendant knowingly created a great risk of death to more than one person," the young child held in Mr. Burrows' arm as he fatally shot his wife.

The following mitigating circumstances were brought out through the appellant's testimony, testimony of other witnesses, instructions by the court, and argument of his counsel:

1. Mr. Burrows was thirty-one (31) years old at the time of the homicide and had no prior history of criminal activity.

2. He had been honorably discharged from the Air Force as a sergeant, after having served four and one-half (4½) years in Okinawa and the Phillipines. After marrying Mrs. Burrows, he received an accounting degree from East Central State College, in Ada, Oklahoma. He earned this degree in two and one-half (2½) years while working his way through school at a grocery store owned by his in-laws. The appellant was employed for four (4) years as an agent and auditor for the Internal Revenue Service, and during this employment, pursued a Masters degree in the Business Administration curriculum at Central State University. At the time of the homicide, he was within three (3) hours of completing his Masters degree.

3. The marriage between the appellant and the victim covered many years of domestic turmoil and strife, including repeated nagging by the victim due to the appellant's chronic drinking problem.

4. It appears from the record that the appellant had consumed a large quantity of vodka and beer the afternoon and evening preceding the homicide.

These factors do not remove the criminality of the appellant's acts. But it is of vital importance that any decision to impose the death sentence be, and appear to be, based on reason rather than on caprice or emotion. *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977).

In my opinion, the mitigating circumstances shown at trial outweigh the aggravating circumstances, considering both the crime committed and the character and background of this particular appellant.

For the above and foregoing reasons, I would remand the case to the district court for the imposition of a sentence of life imprisonment.